**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CRYSTAL D. HUGHES,

      Plaintiffs,                        Case No. 1:13-cv-569

vs.                                  Dlott, J.
                                  Bowman, M.J.

MARTY DONINI, *et al.*,

      Defendants.

**REPORT AND RECOMMENDATION**

This civil action is before the Court on Defendants' motions for summary judgment. (Docs. 61, 62) and the parties' responsive memoranda (Docs. 75, 78, 81, 83) The motions have been referred to the undersigned for initial consideration and a report and recommendation. 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I now recommend that Defendants' motions be granted and this case be closed.

    **I.**    **Background and Facts**:

    *A. Plaintiff's Arrest and Incarceration*

On August 17, 2011, Plaintiff was arrested by the Ohio State Highway Patrol for driving under suspension, falsification and having expired plates. (Doc. 50, Deposition of Crystal Hughes, hereinafter "Hughes Depo.", p. 11, Exhibits 7, 8). She was transported to the Scioto County Jail, but released after a few hours. (*Id.* at pp. 11, 15).

The next day, August 18, 2011, Ms. Hughes appeared in Portsmouth Municipal Court on the aforementioned charges. (*Id.* at p. 15; Amended Complaint, Doc. 21, ¶ 9). According to Ms. Hughes, her "sarcasm" was not appreciated by the municipal court judge and he held her in direct contempt of court. (*Id.* at pp. 16-17; ¶ 12, respectively).

Ms. Hughes was transported to the Scioto County Jail by City of Portsmouth employee Chris Dunham. (Doc. 52, Deposition of Chris Dunham, hereinafter "Dunham Depo.", pp. 43-48). During transport to the jail, Ms. Hughes claims she fell inside the transport van and injured her shoulder. (Hughes Depo., pp. 212-216; Amended Complaint, Doc. 21, ¶¶ 31-36).

Ms. Hughes was booked into the Scioto County Jail just after noon on August 18, 2011. (Hughes Depo., p. 18; Affidavit of Marty Donini, Doc. 61, Ex. 1, hereinafter "Donini Affidavit" at Ex. 7). Among other things, the booking officer noted that Ms. Hughes had a brace on her right leg. (*Id.*).[1] Per policy, Ms. Hughes answered a series of preliminary medical questions. (Hughes Depo., p. 19, Exhibit 2, p. 4; Donini Affidavit, ¶ 12, Exhibits 3, 7). Plaintiff signed the medical screening form. (*Id.* at pp. 21-22, Exhibit 2, p. 5; Donini Affidavit, Exhibit 7).

At the end of the booking process, Ms. Hughes was searched by a female officer. (Hughes Depo., p. 28). Ms. Hughes was permitted to keep her leg brace (a long-leg orthosis). *Id.* Ms. Hughes was also provided with a copy of the Scioto County Correction Center Inmate Rules ("Inmate Rules"). (Hughes Depo., pp. 29-31). Ms. Hughes signed a form indicating that she had read the inmate rules. (*Id.*, Hughes Depo., Exhibit 2).

Notably, the Inmate Rules explain (1) that reasonable medical care is available to inmates and (2) that inmates should request medical care by submitting a "Medical Request Form" to the jail staff. (Hughes Depo., Exhibit 3; Affidavit of John Murphy, Doc.

---

[1] Notably, in 2003, during a routine arthroscopic surgical procedure, Plaintiff suffered a tourniquet injury resulting in permanent damage to the femoral nerve of her right leg. Since that injury, Plaintiff must wear an orthosis on her partially paralyzed right leg for purposes of maintaining knee extension. The orthosis is custom made and custom fit by a prosthesis and it extends from her upper thigh to the lower leg and ankle. It has two lateral metal stays, or uprights, with a manual locking mechanism on each side, at the bend of the knee, which must be locked into place for standing activities and unlocked for sitting or any bending of the knee. (Doc 50, Hughes Depo., pp. 13-14, 19-20, 59-60, 61-69).

61, Ex. 2 hereinafter "Murphy Affidavit" at ¶¶ 7-13, Exhibit 1-3). Ms. Hughes never submitted a written medical care request form. (Hughes Depo., pp. 32-33). Ms. Hughes never asked any corrections officer for assistance with using the shower. (*Id.* at p. 48). Ms. Hughes was released from the jail on August 25, 2011. (Hughes Depo., p. 39, Exhibit 2, pp. 10-12).

Plaintiff, however, makes the following additional allegations:

While being taken into custody at the Courthouse, Plaintiff alleges that she was handcuffed with her hands behind her back, and placed in a chair in the courtroom. (Hughes Depo., pp. 169-170, 191-192). Plaintiff alleges that her assistive device was taken from her as one of the officers or court officials indicated, "You can't have those in there," presumably speaking of the jail. (Hughes Depo., pp. 79, 173-174, 176, 180; Doc. 56, Depo of Letha Lambert Depo., p. 59, 60). According to Plaintiff, she repeatedly voiced concerns about her safety. (Hughes Depo., pp. 203-206).

Upon transport to the Jail, Plaintiff asserts the following with respect to August 18, 2011:

> I told Officer Dunham that I was a Physical Therapist and I offered numerous options for reasonable accommodation concerning my safe transport in the van. I pleaded with Officer Dunham to temporarily un-cuff me in order to unlock my orthosis, to place me in a different seat, place me between two other people, or seatbelt me." I was essentially required to sit with my right leg in the fully extended and locked, position, unable to bend my knees. I repeatedly stated, "I can't do this...I've got a paralyzed leg...I shouldn't be shackled like this...at least temporarily remove my cuffs so that I can unlock my leg, then cuff me back." All requests were either denied or ignored. (Doc. 50, Hughes Depo., p. 202-205).
>
> As Officer Dunham took the first sharp left turn out of the parking area, I was unable to maintain my balance and I fell off of my seat and to the right. I landed on my right shoulder, tearing my right rotator cuff. The right side of my face struck the fender well and my designer prescription glasses were cracked as a result. (Doc. 50, Hughes Depo., p. 212-213). I yelled to

3

> Officer Dunham, "I'm on the floor...you've got to stop...pull over...I'm hurting!" I remained in the floorboard and fender well area of the rear portion of the transport van until it arrived at SCCC [Scioto County Correctional Center]. Once the van arrived at the SCCC, Officer Dunham and a person dressed in a Scioto County Deputy uniform opened the side door, grabbed me and up righted me. I screamed to Officer Dunham, "You really fucked up my shoulder!" (Doc. 50, Hughes Depo., p. 218-219). Officer Dunham responded to me by saying, "Then don't get yourself in jail." (Doc. 50, Hughes Depo., p. 219; Lambert Depo. p. 87).
>
> Portsmouth Transport Officer Dunham offered no medical assistance or treatment to Plaintiff after her fall inside the moving transport vehicle and after finding her in the floor of the transport van while restrained on August 18, 2011. In addition, Officer Dunham never filed an incident report with respect to the events of the August 18, 2011 transport.

(Doc. 75 at 6-8).

Plaintiff alleges nearly identical treatment when she was transported from the jail to her court appearance on August 25, 2011.

Furthermore, with respect to her weeklong stay at SCCC, Plaintiff contends that she was booked into the SCCC just after noon on August 18, 2011 by Officer Kasey Boone. (Hughes Depo., p. 18). She alleges that she reported the shoulder injury and accident in the transport van immediately to booking officer Boone and requested medical attention. (Hughes Depo., p. 25; Booking Information; Doc. 78, Ex.6, Lambert Affidavit at ¶5). However, Plaintiff maintains that she did not receive medical care, an assistive device, or accommodation specific to her mobility impairment or injury following the booking process. (Hughes Depo., p. 36 ).

According to Plaintiff, Officer Boone did not properly document Plaintiff's conditions during the intake process. Plaintiff further alleges that she was not provided with her required medication and did not receive medical care, an assistive device, or accommodation specific to her mobility impairment or injury following the booking

process. (Hughes Depo., p. 36 ). Plaintiff asserts that she requested medical assistance concerning her shoulder and longstanding prescription meds on a daily basis, often several times a day. (Hughes Depo., p. 33, 34, 80, 93, 95). She further alleges that medical request forms were not available at SCCC.

In light of the foregoing, Plaintiff initiated this action on August 16, 2013 pursuant to 42 U.S.C. § 1983 and Sections 504 and Title II of the Americans with Disabilities Act (ADA). (Doc. 2). Ms. Hughes named the following Defendants: (1) Marty Donini, Scioto County Sheriff, (2), Scioto County Sheriff's and Deputy Sheriff's Department, (3) Scioto County Correctional Center and Jail, (4) Scioto County Sheriff Department Transporters (John Doe # 1 & 2), (5) Scioto County, (6) Scioto County Commissioners and (7) the City of Portsmouth, Ohio. (*Id.* at Page ID 15).

Upon *sua sponte* review of the initial complaint, the Court determined that plaintiff's complaint failed to state a claim upon which relief may be granted with respect to the following: (1) Plaintiff's claim against the Scioto County Sheriff, Scioto County, Scioto County's Commissioners and the City of Portsmouth, Ohio based on the theory of negligent supervision and inadequate training of their employees; and (2) Plaintiff's claims against the Scioto County Sheriff's and Deputy Sheriff's Department, the SCCC and the Scioto County Jail. (Doc. 4). *See* 28 U.S.C. § 1915(e)(2)(B). Thereafter, Plaintiff was granted leave to file an amended complaint.

On March 20, 2014, Plaintiff filed her First Amended Complaint. (*See* First Amended Complaint, Doc. 21). In the Amended Complaint, Ms. Hughes attempted to add 8 additional individual defendants, including Officer Chris Dunham and Deputy Kasey Boone. (*Id.* at PageID 92). Upon *sua sponte* review of the amended complaint,

the Court dismissed 5 of the additional defendants. (*See* Report and Recommendation, Doc. 24, Doc. 39).

The remaining three individuals that Ms. Hughes attempted to add in the amended complaint (Chris Dunham, Kasey Boone, and Kristi Powell) were dismissed following motions for judgment on the pleadings. (*See* Docs. 27, 28, 44 and 45). As such, the only defendants remaining are Marty Donini, Scioto County Sheriff[2], Scioto County and Scioto County Commissioners (hereinafter the Scioto County Defendants) and the City of Portsmouth. The remaining defendants now move for summary judgment. For the reasons outlined below, the undersigned finds that Defendants are entitled to judgment as a matter of law.

## II. Analysis

### A. Summary Judgment Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making

---

[2] The claims against Sheriff Donini in his individual capacity were dismissed via the Court's adoption of the undersigned Report and Recommendation. (*See* Doc. 4, p. 5; Doc. 7). However, the official capacity claims as they relate to policies, customs and practices were allowed to proceed. *Id. See also* Doc. 24 re: amended complaint.

credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). It is the Plaintiff's burden to point out record evidence to support her claims. "[T]he Court has no duty when deciding a motion for summary judgment to

7

scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

  B. *Analysis relating to Plaintiff's Official Capacity Claims*

  In *Monell v. Dept. of Social Services*, the Supreme Court held that municipalities (or its agencies) cannot be liable under §1983 on a *respondeat superior* theory, but can be liable if the municipality maintains unconstitutional or illegal policies. To establish an official capacity claim, Plaintiff must show that the law enforcement entity's policy or custom caused the violation of the Plaintiff's federal or constitutional rights. *Hafer v. Melo*, 502 U.S. 21, 25, (1991).

  Thus, in order to establish liability for the Scioto County Defendants and the City of Portsmouth under Section 1983, Plaintiff must show that the County and City policy (or lack thereof) was a "moving force" in the deprivation of Plaintiff's rights and arose from "deliberate indifference" to Plaintiff's rights. *See Doe v. Claiborne County Tennessee*, 103 F.3d 495, 508 (6th Cir. 1996). Since Plaintiff is asserting a Section 1983 claim on the basis of a county policy, she has the burden to "identify the policy, connect the policy to the [county] itself and show that the particular injury was incurred because of the execution of that policy." *See Garner v. Memphis Police Dep't.*, 8 F.3d 358, 364 (6th Cir. 1993, cert. denied 510 U.S. 1177, 114 S.Ct. 1219 (1994)).

  Determining whether the municipality bears responsibility for a constitutional violation requires proof by the injured party of a "direct causal link between municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). To establish such a link

plaintiff must "identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." *Coogan v. Wixom,* 820 F.2d 170, 176 (6th Cir. 1987) (abrogated on other grounds).

1. *Scioto County Defendants*[3]

As detailed above, Plaintiff alleges that various corrections officers violated her constitutional rights because they ignored her medical care requests. (Doc. 21, ¶¶ 41-44). Plaintiff's amended complaint alleges that Scioto County implemented "careless and reckless policies" allowing employees to disregard state law, the ADA and the Constitution and that Scioto County has a routine practice of "dismissal of obvious physical handicaps and disabilities." (Amended Complaint, Doc. 21, at ¶ 67, 77).

Here, the Scioto County Jailed adopted the following policies and procedures:

All inmates shall be provided appropriate medical care under the direction of a licensed physician and through the use of qualified and trained health care personnel. (Donini Aff. ¶ 9). To facilitate the medical program at the Scioto County Jail, policies have been put in place regarding (1) medical personnel, (2) health screening and medical exams, (3) emergency medical care, (4) sick call, (5) inmate medical complaints, (6) documentation of treatment, (7) medication administration and other topics. (*Id.* at ¶ 10, Exhibit 2).

The medical policies apply to disabled inmates who have a medical need; however, the Scioto County Jail also has several policies that specifically relate to

---

[3] Under Ohio law, a county may only be sued through its Commissioners. See ORC § 305.12; *McGuire v. Ameritech Servs. Inc.,* 253 F. Supp.2d 988, 1015 (S.D. Ohio 2003). Furthermore, a sheriff acts on behalf of the entity he represents, i.e. the County. *See Thigpen v. Reid,* 2010 U.S. Dist. LEXIS 130359, 2010 WL 5127649 (N.D. Ohio 2010). Thus, when sued in his official capacity under §1983 the suit is actually against the County. *Id. (citing Monell*, 436 U.S. at 658). Therefore, the Scioto County Commissioners are the proper "Scioto County Defendant" not the Sheriff or the ("County").

disabled inmates. Namely;

> a. The Reception and Release Policy requires that all inmates entering the jail undergo a preliminary health screening. The booking officer is required to observe the inmate and document any physical injuries, deformities or prosthetic devices;

> b. The Inmate Classification Policy requires that "Special needs (mental and physical handicaps)" be taken into consideration when making inmate housing assignments;

> c. The Scioto County Jail has several housing areas and cells that are handicap accessible. These include holding cells 4, 5, and 6, E-Pod (which is a four cell medical unit) and W-1 (which is our women's dorm);

> d. The Strip and Body Cavity Search Policy contains directives for disabled inmates who arrive at the jail wearing or using an artificial device or prosthetic limb.

(Donini Aff. at ¶ 12, Exhibits 3, 4, 5, and 6).

For inmates with mobility based disabilities, the jail has several different types of assistive walking devices available for use including crutches, a walker and a wheelchair. (*Id.* at ¶ 18, Exhibits 4-6). Shower chairs are available for inmates with disabilities. (*Id.* at ¶ 19).

As such, Defendants contend that any intentional disregard of an inmate's request for medical care would be contrary to the policies, procedures and customs of Scioto County, Ohio. (*Id.* at ¶ 22, Donini Affidavit, ¶ 15). Any discrimination against an inmate due to his or her disability would be contrary to the policies, procedures and customs of Scioto County, Ohio. (*Id.* at ¶¶ 23-24; ¶ 16, respectively).  The undersigned agrees.

As noted by the Scioto County Defendants, if its corrections officers ignored Plaintiff's requests for medical care, such officers would have been acting contrary to

policy. (*See* Donini Affidavit, ¶ 15, Exhibit 2) (recognizing right of all inmates to have access to health care and prohibiting denial of access to medical care and treatment); Murphy Affidavit, ¶¶ 14-15). If corrections officers discriminated against Ms. Hughes because of her disability, such officers would be acting contrary to policy. (Donini Affidavit, ¶ 16; Murphy Affidavit, ¶¶ 23-24). Violation of an appropriate policy by an employee cannot be the basis of a *Monell* claim. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) (noting that there can be no municipal liability where "an otherwise sound program has occasionally been negligently administered"); *Kosloski v. Dunlap*, 347 Fed. Appx. 177, 180-181 (6th Cir. 2012) (same).

Furthermore, in support of her claims, Plaintiff retained jail expert Kim Spadaro. Ms. Spadaro was the former Director of the Department of Detention for the Broward County Sheriff's Office which operates the 12th largest jail in the country. (Deposition of Kim Spadaro, Doc. 54, hereinafter "Spadaro Deposition"). She was also the president of the American Jail Association. *Id.* In her report, Ms. Spadaro had no specific criticisms of any of the Scioto County policies she reviewed. (*Id.* at p. 16). After reviewing the same Scioto County jail policies described above (Reception and Release, Classification, Housing, Strip Search and Medical). Ms. Spadaro stated:

> Based on the policies that you enabled me to review today, those policies do seem to be intact. So assuming people are following the policy, then that's the way it should be; but the policies that I reviewed today do seem comprehensive.

(*Id.* at p. 28, see also *Id.* at pp. 17-27).

As such, Plaintiff's own expert agrees that Scioto County's policies for medical care and for disabled inmates are appropriate and reasonable. (Spadaro Depo., pp. 17-28).

In her response to Defendants' motion for summary judgment, Plaintiff lists the

following 10 "customs" and "practices" which she claims led to constitutional violations:

> 1) failure to identify and track disabled or mobility impaired inmates to provide for their special needs; 2) restraint application and use of force applied to inmates, including those with disabilities; 3) safe/appropriate provisions concerning inmate transportation; 4) housing and classification of disabled inmates; 5) failure to review and analyze Grievances for patterns or deficiencies concerning provision of medical care; 6) failure to review number of Medical Request Forms are filed on average before an inmate is seen by medical staff; 7) failure to reform policies and procedures as required; 8) failure to recognize patterns of personal contact by family members to obtain medical care to incarcerated loved ones; 9) failure to ensure staff follow SCCC policies that avoid Constitutional violations; 10) tacit approval of officer conduct including that described herein.

(Doc. 78).

As noted by Scioto County, all of the listed "customs" or "practices" are alleged failures by Scioto County to have a certain practice or policy *in place* that would have prevented the alleged constitutional injury.  Thus, plaintiff must establish that Scioto County approved of a clear and persistent pattern of deliberate unconstitutional conduct. As such, a plaintiff must show a "conscious decision not to act," not merely "a collection of sloppy, or even reckless, oversights." *Doe v. Claiborne Cnty., Tenn. by & through Claiborne Cnty. Bd. of Educ.,* 103 F.3d 495, 508 (6th Cir.1996).  Plaintiff has failed to do so here.

Accordingly, Plaintiff has failed to establish that Scioto County's policies and practices were the "moving force" behind any alleged constitutional violation.  As such, the Scioto County Defendants are entitled to judgment as a matter of law on Plaintiff's *Monell* claims.

2. *City of Portsmouth*

With respect to Plaintiff's *Monell* claims against the city of Portsmouth, Plaintiff must first be able to prove that a City of Portsmouth officer/employee inflicted a constitutional injury upon her on August 18, 2011. Failure to establish such a violation renders her claims against the City of Portsmouth meritless pursuant to *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."). Plaintiff's *Monell* claims also fail if there is an absence of any evidence demonstrating an unconstitutional policy or custom.

In response to the City of Portsmouth's motion for summary judgment, Plaintiff asserts the following:

> The already disabled and mobility impaired Plaintiff then sustained a serious physical injury by the actions, inactions, and omissions of the City of Portsmouth as well as its transporter, Officer Dunham. The Plaintiff suffered numerous and repeated Constitutional violations under the 4th, 5th, 8th, and 14th Amendments throughout her arrest, transports, and incarceration. They include: (1) excessive use of force; (2) failure to intervene or protect from harm; (3) failure to report a serious incident; (4) disability discrimination; (5) deliberate indifference; and (6) denial of medical care.

(Doc. 75 at 10).

Plaintiff purportedly identifies several municipal policies or customs that served as the moving force behind her alleged injuries. Namely, Plaintiff asserts that the City of Portsmouth: (1) had a "total lack of written policies or procedures" in place in August 2011; (2) failed to have a procedure for transporting and restraining wheelchair bounds individuals with a large group of arrestees; (3) failed in its duty to determine the full

extent of Plaintiff special needs; (4) had a practice and custom of intentional disregard for disabled arrestees or inmates. *Id.* at 10-11.

It is well established that "a municipality cannot be held liable solely because it employs a tortfeasor, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell* 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. "[T]he inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). '[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Perez v. Oakland Cty.*, 466 F.3d 416, 430-31 (6th Cir.2006) (quoting *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (internal quotation marks omitted)). Although it is possible that a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability, allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training. *Currie v. Haywood Cty., Tenn.*, 234 F. App'x 369, 372-73 (6th Cir. 2007) citing *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (6th Cir.1998) (internal quotations and citations omitted).

14

First, to the extent that Plaintiff is asserting any claims based upon Portsmouth's failure to train its employees, such claims fail as a matter of law because Plaintiff has offered no proof that other instances of unconstitutional conduct based upon the same policies (or absence of policies) have occurred and been ignored by the City of Portsmouth.  *See Miller v. Sanilac Cty.,* 606 F.3d 240, 255 (6th Cir. 2010); *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being challenged was deficient); *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'"). Thus, it is settled that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989). Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability. *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005); *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (6th Cir.1998). Accordingly, Plaintiff's allegations of improper training cannot defeat the City of Portsmouth's properly supported motion for summary judgment.

15

Thus, Plaintiff is left with her claim that a policy, or the absence of a policy, was the moving force behind the constitutional violations she alleges. Plaintiff must demonstrate that the claimed custom or policy is the driving force behind the alleged constitutional violation. *See Monell,* 436 U.S. at 694 (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy).  However, a plaintiff "cannot survive summary judgment on [a] *Monell* claim by simply relying on the lack of a written policy." *Austin v. Redford Twp. Police Dep't*, 859 F. Supp. 2d 883, 907 (E.D. Mich. 2011) *aff'd,* 690 F.3d 490 (6th Cir. 2012) citing (*Boyd v. Denton County,* 374 F.3d 773, 784 (9th Cir.2004); *see also, Roper v. Hynes,* No. 05 Civ. 7664, 2006 WL 2773032, at *11 (S.D.N.Y. Sept. 27, 2006) ("the lack of a written policy does not itself establish the deliberate indifference required by *Brown.*").

Moreover, disregard for an arrestees safety and well-being would be contrary to the policies, procedures and customs of the City of Portsmouth.  Notably, Mark Malone, the Chief Probation Officer for 15 years for the Portsmouth Municipal Court, testified he was the person who created the policy and procedure security manual for the Portsmouth Municipal Court. (Doc. 58, Malone Depo., p. 11; *See* Exhibit "A" Affidavit of Mark Malone).  Chief Malone testified the written Portsmouth Municipal Court Security Manual was not adopted by the judges until December 1, 2011. (Doc. 58, Malone Depo., p. 39). Chief Malone testified that the policies and procedures which were in place prior to them actually being written into the security manual were already in place. (Doc. 58, Malone Depo., p. 40).

Officer Dunham also testified that although there was not a written policy and procedure manual for the Portsmouth Municipal Court until December of 2011, the manual incorporated policies and procedures which were already in place and had always been done since he worked there. (Doc. 52, Dunham Depo., pp. 12-13). Chief Malone further testified that prior to the adoption of the written Security Manual; he had been the Chief Probation Officer 15 of the 16 years he worked for the Portsmouth Municipal Court. (Doc. 58, Malone Depo., p. 7).

Dunham testified it is the policy of the Portsmouth Municipal Court to absolutely never stop during a prisoner transport. (Doc. 52, Dunham Depo., p. 45). Chief Malone and Officer Dunham both testified that it is Portsmouth Municipal Court's policy and procedure that incident reports be created if an injury is claimed to have resulted while a person was in their custody. (Doc. 52, Dunham Depo., p. 41; Doc. 58, Malone Depo., pp. 22-23). In addition, Dunham testified that when an arrestee in custody is accidentally injured or claims to have been injured, or claims to be sick, the officer must immediately notify the supervisor. (Doc. 52, Dunham Depo., p. 42). Accordingly, any violations of the aforementioned policies, procedure and practices would not be attributable to the City of Portsmouth; thus, Plaintiff's *Monell* claims fail. *See Harris*, 489 U.S. at 391 (Violation of an appropriate policy by an employee cannot be the basis of a *Monell* claim).

*C.  Plaintiff's ADA claims*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132; see also *Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *Thompson v. Williamson County, Tennessee,* 219 F.3d 555, 557 (6th Cir. 2000).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must prove that: (1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program because of her disability." *Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015). Further, the plaintiff must show that the discrimination was intentionally directed toward him or her in particular.  *Id.* at 568 ("'[A]cts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intentional discrimination against [the plaintiff] in particular.'") (citing *Tyler v. City of Manhattan,* 118 F.3d 1400, 1403 (10th Cir.1997)).

Here, Plaintiff appears to assert that she is entitled to compensation under the ADA because she is disabled, the jail lacked handicap accessible facilities, and she was not provided with an assistive walking device.  As noted above, the ADA prohibits acts of *intentional discrimination* by state and local governments aimed at disenfranchising disabled individuals solely because they are disabled. *See Dillery v. City of Sandusky* 398 F.3d 562, 568 (6th Cir. 2005) (finding that plaintiff's claims of intentional discrimination were not satisfied by a general refusal of a government entity to provide access ramps to public spaces). Furthermore, the ADA does not create a remedy for incompetent medical treatment or medical malpractice. The ADA is not violated by a jail simply failing to attend to the medical needs of its disabled prisoners. *Winburn v. Davis*, Case No. 08-14996, 2009 WL 3004555 at *5 (E.D. Mich. 2009) (citing cases).

Even assuming Plaintiff has stated an ADA claim, there is no evidence that she

18

was excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability. *Dillery v. City of Sandusky,* 398 F.3d 562, 567 (6th Cir.2005) (citing *Jones v. City of Monroe,* 341 F.3d 474, 477 (6th Cir.2003)).  As noted by the Scioto County defendants, during her week long incarceration at the Scioto County Jail, Plaintiff was provided with the same services as any other inmate.  When asked what program or activity she was denied, Plaintiff stated that she was denied the opportunity to "safely, you know, use the public shower…." (Hughes Depo. at 47). However, the record indicates that Plaintiff never asked any corrections officer for assistance using the shower. (*Id.* at p. 48). Additionally, during her transport to the Scioto County jail, Hughes was provided with the same services as any other inmate.

As such, there is no evidence the Hughes was intentionally discriminated against due to her claimed disability.  Accordingly, Portsmouth is entitled to summary judgment with respect to such claim.

### III. Conclusion

For these reasons, **IT IS THEREFORE RECOMMENDED THAT** Defendants' motions for summary judgment (Docs. 61, 62) be **GRANTED** and this case is therefore **TERMINATED** on the active docket of the Court.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CRYSTAL D. HUGHES,

      Plaintiffs,                         Case No. 1:13-cv-569

vs.                                    Dlott, J.
                                        Bowman, M.J.

MARTY DONINI, *et al.*,

      Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).